

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Boys and Girls Clubs of Puerto Rico, Inc., PBL of Puerto Rico, Inc.<br><br>    Demandantes-Peticionarios<br><br>v.<br><br>Hon. Juan C. Méndez Torres, Secretario del Departamento de Hacienda, Teresita Carrión Geigel, en su carácter oficial como Secretaria Auxiliar de Lotería; y Teresita Carrión Geigel en su carácter personal y su esposo Fulano de Tal y la Sociedad Legal de Gananciales compuesta por ambos; Estado Libre Asociado de Puerto Rico; Aseguradora A,B, y C; Zutanos de Tal<br><br>    Demandados-Recurridos | Certiorari<br><br>2010 TSPR 167<br><br>179 DPR \_\_\_\_ |

Número del Caso: CC-2007-970

Fecha: 4 de agosto de 2010

Tribunal de Apelaciones:

                Región Judicial de San Juan-Panel III

Panel integrado por su presidenta, la Juez Bajandas Vélez, y los Jueces Aponte Hernández y Morales Rodríguez

Abogados de la Parte Peticionaria:

        Lcdo. Agustín Mangual Amador
        Lcdo. Homero González López
        Lcda. Adalys E. Díaz Ortiz

Oficina del Procurador General:

        Lcda. Leticia Casalduc Rabell
        Subprocuradora General

Materia: Solicitud de Sentencia Declaratoria; Injuction Preliminar y Permanente; Daños y Perjuicios; Interferencia Torticera con Relaciones Contractuales de Terceros; Difamación

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Boys and Girls Clubs of Puerto Rico, Inc., PBL of Puerto Rico, Inc.<br><br>    Demandantes-Peticionarios<br><br>              v.<br><br>Hon. Juan C. Méndez Torres, Secretario del Departamento de Hacienda, Teresita Carrión Geigel, en su carácter oficial como Secretaria Auxiliar de Lotería; y Teresita Carrión Geigel en su carácter personal y su esposo Fulano de Tal y la Sociedad Legal de Gananciales compuesta por ambos; Estado Libre Asociado de Puerto Rico; Aseguradora A, B, y C; Zutanos de Tal<br><br>    Demandados-Recurridos | CC-2007-0970 | *Certiorari* |

Opinión del Tribunal emitida por la Jueza Asociada Señora PABÓN CHARNECO

San Juan, Puerto Rico a 4 de agosto de 2010.

Comparecen ante nos los peticionarios, Boys and Girls Clubs of Puerto Rico, Inc., en adelante, compañía peticionaria, y PBL of Puerto Rico, Inc., en adelante, PBL. Nos solicitan la revisión de una Sentencia en Reconsideración del Tribunal de Apelaciones, mediante la cual el foro intermedio confirmó el dictamen del Tribunal de Primera Instancia que desestimó la Demanda instada contra, entre otras partes, el Departamento de Hacienda.

En vista de que nuestro ordenamiento jurídico prohíbe los juegos de azar y loterías – salvo contadas excepciones

por razones de orden público – y de que la Ley Núm. 465 de 15 de mayo de 1947, según enmendada, conocida como Ley de la Lotería de Puerto Rico, 15 L.P.R.A. secs. 111 *et seq.*, no adolece de vaguedad ni contraviene el principio de legalidad, declaramos que el juego "Raspa y Gana", endosado por la parte peticionaria es un juego prohibido. Esto, pues, las organizaciones que realizaban loterías sin fines pecuniario de conformidad con el Artículo 291 del Código Penal anterior, no gozan de este privilegio luego de su derogación.

## I

La corporación peticionaria es una corporación sin fines de lucro registrada en el Departamento de Estado, cuya finalidad es proveer servicios de educación, prevención y recreación a niños(as) y jóvenes. Desde junio de 2004, su principal fuente de recaudación de fondos es el juego conocido como "Raspa y Gana".[1] La corporación peticionaria contrató a PBL para la administración del juego. Éste consiste en la compra por un dólar ($1.00) de un cartón con tres (3) combinaciones de números ensombrecidos. Si al ser raspado alguna de las combinaciones es igual a los números de la casa (números descubiertos en el lado izquierdo del cartón), el jugador puede ganar desde cinco hasta cinco mil dólares ($5.00–$5,000.00).

---

[1] Este juego le genera a la peticionaria entre veinticinco mil (25,000) a setenta y cinco mil (75,000) dólares mensuales.

El 24 octubre de 2005, el entonces Secretario de Hacienda, Juan C. Méndez Torres, remitió una misiva a la corporación peticionaria ordenándole culminar cualquier actividad relacionada con dicho juego en o antes del 30 de junio de 2006 puesto que no contaba con la autorización requerida para operar el mismo. Esto debido a la adopción de un nuevo Código Penal y enmiendas a la Ley Núm. 10 de 24 de mayo de 1989, según enmendada, conocida como Ley para Autorizar el Sistema de Lotería Adicional, 15 L.P.R.A. secs. 801 *et seq.,*[2] que otorgaron al Secretario de Hacienda discreción absoluta para autorizar la celebración de juegos de lotería adicional.[3]

A su vez, surge de autos que bajo esos mismos fundamentos y haciendo la salvedad de que el Secretario de Hacienda decidió no autorizar a ninguna persona a celebrar juegos de lotería adicional o actividades relacionadas, el 15 de noviembre de 2005, la entonces Secretaria Auxiliar de Loterías, Teresita Carrión Géigel, informó a los vendedores autorizados de lotería adicional que si a partir del 1 de diciembre de 2005 continuaban:

> ...vendiendo algún boleto o juego de lotería adicional no autorizada o actividades relacionadas, tales como juegos instantáneos, "raspaítos" u otros, que no sean los boletos de la Lotería Electrónica que se le[s] autoriza vender […] estar[ían] sujeto[s] a cualquier acción por las agencias de orden público concernidas y su[s] contrato[s] con la Lotería

---

[2] Ley Núm. 320 de 15 de septiembre de 2004.

[3] Previo al recibo de la Orden, la Secretaria Auxiliar de Loterías, el Director Ejecutivo de la compañía peticionaria y el Gerente General de PBL se reunieron para discutir los cambios a las leyes aplicables.

Adicional podr[ían] ser dejado[s] sin efecto de inmediato.[4]

Ante lo anterior, los peticionarios instaron una Demanda solicitando al Tribunal de Primera Instancia, *inter alia*, que emitiera una sentencia declaratoria mediante la cual estableciera que el juego "Raspa y Gana" se encontraba dentro del marco de la Ley; una orden de *injunction* preliminar y permanente prohibiendo a los recurridos interferir con las relaciones contractuales existentes entre los peticionarios; así como el resarcimiento de los daños y perjuicios ocasionados.

Los peticionarios alegaron que al juego "Raspa y Gana" no le aplicaba la Ley Núm. 10, *supra,* por no cumplir con la definición de "lotería adicional" dispuesta en el estatuto, como tampoco la Ley Núm. 465, *supra*, que no definía el término "lotería" conforme al principio de legalidad. Señalaron que las actuaciones de los recurridos les violaban sus "derechos estatutarios y constitucionales al privarles de forma *ultra vires* del derecho de llevar a cabo una actividad que no ha sido prohibida por ley o Código alguno, al intervenir con contratos de negocios y al manchar el buen nombre y reputación [así como] al acusarlos de estar llevando a cabo un actividad ilegal".[5]

Además, plantearon que la medida provocaría el cierre de gran parte de las operaciones de la corporación

---

[4] Apéndice de la Petición de C*ertiorari* págs.54-55.

[5] Apéndice de la Petición de *Certiorari*, pág. 46.

peticionaria, el cierre total de PBL, y la pérdida de más de medio millón de dólares ($500,000.00) en recaudos.

Por otra parte, la parte recurrida alegó que las loterías privadas estaban prohibidas por nuestro ordenamiento jurídico y que el juego "Raspa y Gana" era una lotería o juego de azar prohibido bajo la Ley Núm. 465, *supra,* al coincidir en ella los elementos de pago, azar y premio. Señaló que la prohibición de las loterías abarcaba cualquier lotería no auspiciada por el Estado sin importar los fines de éstas.

Trabada la controversia entre las partes, el Tribunal de Primera Instancia desestimó la causa de acción mediante la Sentencia emitida el 23 de junio de 2006. Esto, al determinar que la actividad de recaudación de fondos en controversia era un juego de azar prohibido por la Ley Núm. 465, *supra*, y sometido a la regulación del Departamento de Hacienda. Concluyó, por consiguiente, que las órdenes emitidas por el Secretario de Hacienda eran válidas.

Insatisfechos, los peticionarios acudieron al Tribunal de Apelaciones. En un principio el foro apelativo intermedio revocó la Sentencia apelada, señalando que el foro de instancia no había resuelto la controversia planteada ante sí, o sea, la aplicabilidad de la Ley Núm. 10, *supra*, a la actividad "Raspa y Gana".

Inconforme, el Departamento de Hacienda instó reconsideración. Indicó que los peticionarios solicitaron

"una declaración sobre la legalidad de 'Raspa y Gana'". El foro apelativo intermedio, en reconsideración, dejó sin efecto su dictamen anterior, confirmando así la determinación del Tribunal de Primera Instancia. En la Sentencia en Reconsideración el foro *a quo* determinó que el juego de "Raspa y Gana" era una "lotería clandestina" según definido por ley y que todas las loterías que no fueran las autorizadas expresamente por el estatuto estaban prohibidas en nuestra jurisdicción. Razonó que éste era un nuevo delito, distinto al del derogado Artículo 291 del Código Penal de 1974. Asimismo, entendió que aunque el juego en controversia era un eficaz instrumento de recaudación de fondos en manos de una organización de tanto mérito como la peticionaria, éste era un juego prohibido por ley, y no podía continuar mientras no fuera oficialmente autorizado por el Secretario de Hacienda como una lotería adicional.

Insatisfechos, los peticionarios acuden ante nos planteando como error:

> **Erró el Tribunal de Apelaciones al confirmar la determinación del T.P.I. de desestimar la demanda de sentencia declaratoria alegando que la actividad de recaudación de fondos 'Raspa y Gana' es una lotería clandestina, a tenor con la Ley 321 de 15 de septiembre de 2004.**

Examinado el recurso, expedimos el auto solicitado. Procedemos a resolver con el beneficio de la comparecencia de ambas partes.[6]

---

[6] Aunque en un principio la parte recurrida no compareció a tiempo ante este Foro, permitimos la presentación tardía de su alegato de

Los peticionarios argumentan que la omisión de la definición de "lotería" en el nuevo Código Penal, así como en la ley especial, creó un vacío legal por lo que no se puede concluir que exista delito. Sostienen que la redacción actual solamente castiga la falsificación de billetes de lotería. Por consiguiente, concluyen que las enmiendas carecen de connotación delictiva según obliga el principio de legalidad. Asimismo, expresan que de no existir vacío legal, hay vaguedad. Además, argumentan que su actividad de recaudación de fondos no se puede enmarcar dentro del concepto "clandestino" al ser una actividad anunciada públicamente y no secreta u oculta.[7] Asimismo, expresan que adoptar los elementos del delito de la lotería clandestina según esbozó el Tribunal de Apelaciones equivaldría a encausar criminalmente a un sinnúmero de instituciones. De igual forma, reiteran que se les violaron sus derechos estatutarios y constitucionales al privarles de forma *ultra vires* del derecho a llevar a cabo una actividad que no había sido prohibida sin el beneficio de su participación.

*A contrario sensu*, la parte recurrida alega que el Estado ha prohibido los juegos de azar privados por razones de política pública, particularmente como medida para controlar el fraude y como mecanismo de recaudos para

---

conformidad con la Regla 50 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A, R. 50.

[7] El Diccionario de la Real Academia Española define "clandestino" como "secreto, oculto, y especialmente hecho o dicho secretamente por temor a la ley o para eludirla". Real Academia Española, Diccionario de la Lengua Española, Ed. Espasa, Madrid, 2001, pág. 564.

el Estado. Admite que, aunque durante un periodo de tiempo se permitió a ciertas organizaciones llevar a cabo loterías, tal exención fue eliminada con la adopción del Nuevo Código Penal. Añade que esto fue informado a la parte peticionaria. Asimismo, argumenta que la falta de una definición de "lotería" no implica que la ley penal sea inconstitucional. Es contención de la parte recurrida que la Ley Núm. 465, *supra*, solamente requiere ser interpretada y que conforme al contexto y uso común del término, ésta provee la advertencia adecuada. Además, expresa que tradicionalmente se han reconocido como requisitos de todo juego de azar los elementos de pago, azar y premio; elementos con los que cumple el juego de los peticionarios. Argumenta también que ante el uso común del término y los elementos de la lotería reconocidos por este Tribunal, no cabe arbitrariedad por parte de los agentes del Orden Público.

**II**

Nuestro ordenamiento constitucional restringe el poder punitivo del Estado. L.E. Chiesa Aponte, *Derecho Penal Sustantivo,* San Juan, Ed. Publicaciones JTS, 2007, pág. 16. Entre las limitaciones exige, a tenor con la doctrina de vaguedad, que las conductas penadas sean descritas de forma clara y adecuada. Sobre este particular hemos dispuesto que:

> una ley adolece de vaguedad si: (1) una persona de inteligencia promedio no queda debidamente advertida del acto u omisión que el estatuto pretende prohibir y penalizar; (2) se presta a

la aplicación arbitraria y discriminatoria, e (3) interfiere con el ejercicio de derechos fundamentales garantizados por la Constitución. *Pueblo v. APS Healthcare of P.R., Inc.*, 175 D.P.R. __ (2009), 2009 T.S.P.R. 11, 2009 J.T.S. 14; *Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139 (1973).

Por otra parte, el principio de legalidad conlleva el que no se pueda dictar sentencia condenatoria "por hechos que la ley previamente no hubiese declarado punibles". *Pueblo v. Ríos Dávila*, 143 D.P.R. 687, 697 (1997). Conforme a éste, la ley tiene que establecer adecuadamente la conducta prohibida así como la pena a imponerse. Por lo que,

> [n]o se instará acción penal contra persona alguna por un hecho que no esté expresamente definido como delito en este Código o mediante ley especial, ni se impondrá pena o medida de seguridad que la ley no establezca con anterioridad a los hechos. Artículo 2 del Código Penal de 2004, 33 L.P.R.A. sec. 4630.

No obstante, hemos expresado en repetidas ocasiones que el que la ley requiera ser interpretada no implica su invalidez. *Pueblo v. APS Healthcare of P.R., Inc., supra*; *Pueblo v. Sierra Rodríguez*, 137 D.P.R. 903 (1995). Esto, puesto que todas las leyes requieren en menor o mayor medida, ser interpretadas. *Pueblo v. Ruiz Martínez*, 159 D.P.R. 194; *Pueblo v. Zayas*, 147 D.P.R. 530 (1999); *Pueblo v. Ríos Dávila, supra*. Pero tal ejercicio debe hacerse de forma que cumpla con la verdadera intención del legislador y a consciencia de sus consecuencias. *Pueblo v. Ríos Dávila, supra*; *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404 (1988).

Así las cosas, la función de los tribunales es interpretar y aplicar la ley penal, y no crearla ni cambiarla. *Pueblo v. Ríos Dávila*, *supra*. Véase, D. Nevares Muñiz, *Derecho Penal Puertorriqueño: Parte General*, San Juan, Instituto para el Desarrollo del Derecho, Inc., 2005, pág. 79. Para ello debemos emplear las normas de hermenéutica penal contenidas en el Código Penal.[8]

Al respecto, el Artículo 13 del Código Penal, 33 L.P.R.A. sec. 4641, establece que:

> Las palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente.
>
> ...
>
> Si el lenguaje empleado es susceptible de dos o más interpretaciones, debe ser interpretado para adelantar los propósitos de este Código y del artículo particular objeto de interpretación.

Cabe señalar, además, que la interpretación de una disposición penal no debe hacerse de forma aislada ni de forma literal que lleve a resultados absurdos. *Pacheco v. Vargas, Alcaide*, *supra*. Por ende, la interpretación del estatuto penal no debe aislarse de las restantes disposiciones de la ley ni del ordenamiento penal, como tampoco de la realidad social de donde surge y opera. *Íd., pág. 410; Pueblo v. Ríos Dávila*, *supra,* pág. 697; *Pueblo v. Sierra Rodríguez*, *supra,* pág. 911.

---

[8] "Los principios contenidos en este subtítulo aplican a la conducta regulada por otras leyes penales, salvo que éstas dispongan lo contrario". 33 L.P.R.A. sec. 4639.

En el caso de autos analizamos, *inter alia*, si la Ley Núm. 465, *supra*, es aplicable al caso de autos y si el término "lotería clandestina" en ella contenido provee un aviso adecuado a los ciudadanos.

### III

La presente controversia requiere que ahondemos en la historia de la prohibición de los juegos de azar en Puerto Rico, para mejor entender los delitos de juego en nuestro ordenamiento jurídico actual.

El Código Penal de 1902 tipificaba los delitos relacionados a los juegos de azar y loterías al adoptar un estatuto de similar redacción del estado de California.[9] La vigencia provisional de estas disposiciones se mantuvo en las subsiguientes reformas al Código Penal.

Además de las disposiciones penales contenidas en el Código Penal, la Asamblea Legislativa aprobó diversas leyes especiales relacionadas a los juegos de azar.[10] No obstante, durante la reforma efectuada al Código Penal en el 2004, la Asamblea Legislativa optó por tipificar los delitos de "juego" en las referidas leyes especiales,

---

[9] Véase, Artículo 319 del Código Penal de California. Bien es sabido que el Código Penal de 1902 procedía del Código Penal del estado de California.

[10] Ley Núm. 465 de 15 de mayo de 1947, según enmendada, conocida como Ley de la Lotería de Puerto Rico, 15 L.P.R.A. secs. 111 *et seq.*; Ley Núm. 220 de 15 de mayo de 1948, según enmendada, conocida como Ley de la Bolita, 33 L.P.R.A. secs. 1247 *et seq.*; Ley Núm. 221 de 15 de mayo de 1948, según enmendada, conocida como Ley de Juegos de Azar, 15 L.P.R.A. sec. 71 et seq.; Ley Núm. 242 de 8 de mayo de 1950, según enmendada, 15 L.P.R.A. secs. 151 *et seq.*; Ley Núm. 10 de 24 de mayo de 1989, según enmendada, conocida como Ley para Autorizar el Sistema de Lotería Adicional, 15 L.P.R.A. secs. 801 *et seq.*

transfiriendo el contenido del anterior Código Penal a éstas. Analicemos estas leyes.

### A. Juegos de Azar

Nuestro ordenamiento prohíbe los juegos de azar. Ley Núm. 221 de 15 de mayo de 1948, según enmendada, 15 L.P.R.A. sec. 71 *et seq*. La Sección 2 de la Ley Núm. 221, *supra*, expresa que:

> Incurrirá en delito menos grave toda persona que juegue, tome parte, tenga establecido, abra, haga abrir o dirija, como principal o empleado, por alquiler o de otro modo cualquier juego de faro, monte, ruleta, fan tan, póquer, siete y media, veintiuna, hokey-pockey [sic] o cualquier juego de azar con barajas, dados, o de cualquier otra clase, por dinero, cheques, crédito o fichas representando valores, así como toda persona que juegue o apueste a favor o en contra en cualquiera de dichos juegos prohibidos.
>
> No obstante, se autorizan los juegos de azar de ruleta, dados, barajas y bingos, en salas de juegos explotadas por la franquicia expedida[…]. 15 L.P.R.A. sec. 71.

No obstante, la Asamblea Legislativa ha autorizado ciertos juegos por vía de excepción debido a razones de orden público.[11] *United Hotels of P.R. v. Willig*, 89 D.P.R. 188, 191 (1963); *Serra v. Salesian Society*, 84 D.P.R. 322, 328 (1961). Al respecto, este Foro ha expresado que:

> Es innegable que la Asamblea Legislativa tiene plenos poderes para prohibir los juegos de azar.

---

[11] A tales efectos, el ordenamiento jurídico permite, *inter alia*, como excepciones, el juego de loto o lotería denominado 'bingo' para fines caritativos o educativos, Ley Núm. 242, *supra*; las salas de juegos operadas mediante franquicia expedida por el Comisionado de Instituciones Financieras y fiscalizadas por la Compañía de Turismo, Ley Núm. 221, *supra*, y las picas durante las fiestas patronales, Ley Núm. 25 de 23 de abril de 1927, según enmendada, 15 L.P.R.A. sec. 80.

Es igualmente innegable que dicha asamblea tiene facultad para autorizar ciertos juegos de azar, permitiendo que los mismos sean establecidos o explotados mediante el cumplimiento de determinados requisitos. También es innegable que la Asamblea Legislativa, al prohibir de manera terminante el establecimiento de algunos juegos de azar, puede hacer excepciones y autorizar que los mismos sean establecidos y explotados, siempre que se cumplan determinados requisitos. *Irizarry v. Villanueva,* 70 D.P.R. 75, 78 (1949).

Hemos aceptado que estas facultades de legislar se fundamentan:

...no ya en virtud de conceptos de moralidad, sino en consideración a otros fines públicos de valía, entre los cuales se destaca la reglamentación de todos los juegos de azar, con miras a proteger que los mismos no caigan en manos inescrupulosas y se anule su utilidad social como fuentes de ingresos gubernamental. *Pueblo v. Troche Mercado*, 105 D.P.R. 501 (1976).

Cabe señalar que el Departamento de Hacienda es el encargado de "implantar, desarrollar, supervisar y coordinar la política pública, los organismos y programas dirigidos a los juegos de azar y las instituciones financieras". 3 L.P.R.A. Ap. IX, Art. 1.

Aunque en nuestro ordenamiento estatutario no ha existido definición del término "juegos de azar", contamos con una definición jurisprudencial que consta de tres (3) elementos: (i) el pago o prestación que se hace o se promete para participar en el juego de azar; (ii) el azar o suerte por medio del cual se gana el premio, y (iii) el premio que constituye algo de valor pecuniario que la persona recibe directamente u obtiene el derecho de

recibir.[12] *Sun Design Video v. ELA,* 136 D.P.R. 763, 768 (1994); *Serra v. Salesian Society*, *supra*, pág. 329. A base de dicha definición se ha entendido que las "máquinas que puedan usarse para fines de juego de azar" están comprendidas dentro del término.[13] *Sun Design Video v. ELA, supra,* pág. 766.

### B. Lotería

Un tipo de juego de azar que goza de una larga trayectoria en nuestro país es la lotería.[14] Hoy día, coexisten en Puerto Rico la "Lotería de Puerto Rico" (*Lotería Tradicional*) y el "Sistema de Lotería Adicional" (*Lotería Adicional o Lotería Electrónica*). Ambas han sido concebidas, *inter alia*, como medidas de recaudación de

---

[12] Hemos definido estos tres (3) elementos. "La *prestación* es el pago o la apuesta que el jugador se arriesga a perder si no tiene éxito en el juego." *Sun Design Video v. ELA,* 136 D.P.R. 763, 770 esc. 8 (1994) Por otro lado, "[e]l *azar* es la contrapartida de la habilidad del jugador. […] En *Pueblo v. Santana*, 48 D.P.R. 808 (1935), establecimos que no es necesario para que pueda calificarse un juego como de azar *per se*, que se excluya por completo el elemento de habilidad del jugador". *Íd.*, pág. 770 esc. 9.

[13] Previamente este Foro había expresado "que aquellos juegos de azar que no se mencionan expresamente en el artículo [299 del Código Penal entonces vigente, ahora Sección 2 de la Ley 221, *supra*], no son prohibidos a menos que haya una persona que abra, dirija o administre la jugada, y reciba alguna ganancia o beneficio." *Pueblo v. Soto,* 66 D.P.R. 166 (1946). No obstante, posteriores decisiones modificaron esa Opinión.

[14] La lotería en nuestra Isla goza de una larga historia. Previo a que el Gobierno Militar de la Isla aboliera la Diputación Provincial de Puerto Rico, existía en Puerto Rico la "Lotería Provincial de Puerto Rico" por Real Orden desde 1877. *Chevremont et al. v. El Pueblo de Pto. Rico,* 1 D.P.R. 431, 433, 435 (1903)("La Lotería se vió obligada á suspender el sorteo por la guerra, no pudiendo llevarlo á efecto después por impedirlo las leyes de los Estados Unidos…" En dicho momento histórico "los billetes de la Lotería […] se consideraban […] ‹valores del Estado› y documentos al portador, quedando los que los falsifiquen, enmienden ó alteren sujetos á las prescripciones del Código Penal". Posteriormente se promulgaron los siguientes estatutos: Ley Núm. 42 de 14 de mayo de 1934, derogada; Ley Núm. 212 de 15 de mayo de 1938, derogada; Ley Núm. 465, *supra*; Ley Núm. 220, *supra*; Ley Núm. 242, *supra*; Ley Núm. 219 de 23 de julio de 1974, derogada; Ley Núm. 10, *supra*.

ingresos para el Gobierno de Puerto Rico, por lo que han sido autorizadas, establecidas y supervisadas por el Estado. *A contrario sensu*, el establecimiento, conservación y explotación de loterías no conformes con la ley han sido prohibidos.[15]

La Lotería de Puerto Rico que hoy día conocemos fue establecida mediante la Ley Núm. 465, *supra*. Actualmente, el Negociado de la Lotería, adscrito al Departamento de Hacienda de Puerto Rico, tiene a su cargo todo lo concerniente a la dirección y administración de la misma. 15 L.P.R.A. sec. 111. Además, el Secretario de Hacienda está autorizado a dictar, con la aprobación del Gobernador/a de Puerto Rico, aquellas reglas y reglamentos necesarios para hacer efectivas las disposiciones de la referida ley. 15 L.P.R.A. sec. 126.

Posteriormente, mediante la Ley Núm. 10, *supra*, se introdujo en Puerto Rico el Sistema de Lotería Adicional, regulado también por el Secretario de Hacienda y supervisado por el Negociado de la Lotería. 15 L.P.R.A. secs. 802, 804.

### C. Prohibición de la lotería

Como señaláramos anteriormente, la Ley Núm. 465, *supra*, además de establecer la Lotería Tradicional, prohibió expresamente el establecimiento, conservación y

---

[15] Véase, esc. 9, *supra*.

explotación de loterías en Puerto Rico que no fueran exceptuadas por la ley.[16]

Hasta el 2004, la Ley Núm. 465, *supra*, remitía a las disposiciones dispuestas en el Código Penal relacionadas al delito de lotería. Entonces, este tipo de juego de azar era definido como:

> …cualquier plan para la disposición o distribución de dinero o bienes por suerte, entre personas que hayan pagado o prometido pagar cualquier precio o compensación por correr la aventura de obtener dichos objetos o parte de ellos, o cualquier acción o interés en los mismos, en virtud de algún acuerdo, inteligencia, o esperanza de que habrán de distribuirse por suerte, llámese lotería, rifa, empresa de regalos o por cualquier otro nombre. Artículo 291 del Código Penal de 1902.

Cónsono con lo anterior, y de conformidad con la doctrina prevaleciente, este Tribunal ha admitido los "tres elementos que tradicionalmente han sido considerados por la jurisprudencia como esenciales para que exista la lotería o juego de azar prohibido por los estatutos. Estos tres elementos son (i) el premio, (ii) el azar o suerte por medio del cual se gana el premio y (iii) el pago o prestación (*"consideration"*) que se hace o se promete para tener derecho a participar en la rifa o lotería". *Serra v. Salesian Society*, *supra*, pág. 329; *Pueblo v. Swiggett*, 37 D.P.R. 911 (1928).

---

[16] El Código Penal de 1902 prohibía, entre otras cosas, el inventar, preparar, establecer y jugar, cualquier lotería. Para entonces existía una veda total de la lotería en Estados Unidos que duró hasta principio de la década de 1960. Aun cuando esa fuera la situación en Estados Unidos, ya para 1935 se autorizó la primera lotería estatal en Puerto Rico.

En *Serra v. Salesian Society*, *supra*, caso sobre una disputa relacionada a una rifa organizada por una entidad religiosa, se analizó la prohibición de la lotería en el entonces vigente Código Penal. Este Foro concluyó que la rifa objeto de análisis cumplía con la definición establecida en la ley, así como con los "tres elementos que tradicionalmente han sido considerados por la jurisprudencia como esenciales para que exista la lotería o juego de azar". *Íd.*, pág. 329. Dado que la actividad en cuestión era una prohibida por ley, rehusamos proveer auxilio en dicho caso. Esto, a pesar de que los "*motivos* reales o alegados [de la actividad] sean o parezcan buenos, ya sean estos caritativos, religiosos, de promoción comercial, etc." *Íd.*, pág. 329. No obstante, debe señalarse que no fue hasta 1986 que la Asamblea Legislativa autorizó a ciertas organizaciones a realizar loterías con propósitos legítimos. Ley Núm. 36 de 5 de junio de 1986.[17] Al así hacerlo, expresó que "lo que el Gobierno pretende regular, son los grandes movimientos de dinero e ingresos que el Gobierno no puede perseguir para

---

[17] Mediante enmienda al Artículo 291 del Código Penal se dispuso que:

> …quedan excluidas de las disposiciones de las secs. 1211 a 1218 de este título, ambas inclusive, las organizaciones o entidades cívicas, deportivas, culturales, religiosas y partidos políticos, siempre que realicen las loterías con propósitos legítimos, sin fines pecuniarios y que las entidades se encuentren inscritas en el correspondiente organismo gubernamental. Todas las entidades vendrán obligadas a radicar en el Departamento de Hacienda en o antes del día 15 de febrero de cada año, un informe expresando todas las loterías que realizaron y, además, una copia del anterior informe deberá radicarse en el organismo en el cual se encuentran legalmente registradas. 33 L.P.R.A. sec. 1211 (2001).

su justa tributación y no la conducta de las personas envueltas…" Exposición de Motivos de la Ley Núm. 36, *supra,* 1986 Leyes de Puerto Rico 96. Puesto que las organizaciones sin fines de lucro reglamentadas por el Estado no incurren en una conducta que perjudica a la sociedad, fueron excluidas de la prohibición de las loterías. Solamente se les requirió estar debidamente inscritas y presentar un informe ante el Departamento de Hacienda conforme dispuesto en la ley. *Íd.*

No obstante, en el 2004 la Asamblea Legislativa optó por tipificar los delitos relacionados al juego de azar y lotería en las leyes especiales concernidas. Con respecto a la Lotería Tradicional, se enmendó la Ley Núm. 465, *supra,* "para incorporar[le] los delitos del Código Penal de 1902 que quedaron provisionalmente vigentes al aprobarse el Código Penal de 1974",[18] reformulando varias disposiciones del Código Penal en el artículo que es pertinente para el caso de autos. El Artículo 14 de la Ley Núm. 465, *supra,* actualmente dispone que:

> El establecimiento, conservación y explotación de loterías en Puerto Rico, excepto en las [sic] forma descrita en las secs. 111 a 127e de este título, queda prohibido en Puerto Rico.

> Toda persona que invente, prepare, establezca o juegue cualquier lotería clandestina en violación a las disposiciones de las secs. 111 a 127e de este título o venda, ceda, o en cualquier forma supla o traspase a otro o a un tercero, algún billete, suerte, acción o interés, o algún papel, certificado o instrumento que se presuma o entienda ser o

---

[18] Título, Ley Núm. 321 de 15 de septiembre de 2004.

represente algún billete, suerte o acción, o interés en cualquier lotería en violación a las disposiciones de las secs. 111 a 127e de este título o que dependiere del resultado de la misma, incurrirá en delito menos grave. 15 L.P.R.A. sec. 124.[19]

Sin embargo, la enmienda mantuvo las conductas prohibidas, pero no incorporó la definición del concepto "lotería" como tampoco trasladó la exclusión de las organizaciones sin fines lucrativos – que realizan loterías con fines legítimos – de las disposiciones pertinentes. Sobre este último aspecto, ante la ausencia de tal exclusión, **debemos concluir que ya no existe tal privilegio y que solamente los juegos y loterías sancionadas por la ley son permitidos por nuestro**

---

[19] Previo a la enmienda, el Artículo 14 de la Ley Núm. 465, *supra*, disponía que:

> El establecimiento, conservación y explotación de loterías en Puerto Rico, excepto en las [sic] forma descrita en las secs. 111 a 127e de este título, queda prohibido en Puerto Rico. Las personas convictas del delito de lotería preceptuado en el Capítulo VIII del Código Penal, secs. 1211 a 1218 del Título 33, se castigarán en la forma provista en el citado código. 15 L.P.R.A. sec. 124 (2000).

Asimismo, el Artículo 292 del previo Código Penal expresaba que:

> Toda persona que inventare, preparare, estableciere o jugare cualquier lotería, será reo de delito menos grave. 33 L.P.R.A. sec. 1212 (2001).

De igual forma, el Artículo 293 del previo Código Penal expresaba que:

> Todo el que vendiere, cediere, o en cualquier forma supliere o traspasare a otro o a un tercero, algún billete, suerte, acción o interés, o algún papel, certificado o instrumento que se presumiere o entendiere ser o representar algún billete, suerte o acción, o interés en cualquier lotería, o que dependiere del resultado de la o entendiere ser o representar algún billete, suerte o acción, o interés en cualquier lotería, o que dependiere del resultado de la misma, será reo de delito menos grave. 33 L.P.R.A. sec. 1213 (2001).

**ordenamiento**.[20]   Ello  a  pesar  de  que  los  *motivos*  de  la

actividad  sean  o  parezcan  buenos.     *Serra  v.  Salesian*

*Society*,  *supra*.    No  obstante,  con  relación  a  la  falta  de

esa  definición  del  texto  de  la  ley,  debemos  analizar  qué

implicaciones  tiene,  siendo  éste  un  estatuto  de  carácter

penal.

**III**

Respecto  a  la  conducta  a  sancionarse,  las  expresiones

de  la  Asamblea  Legislativa  respecto  a  los  juegos  de  azar  y

las  loterías  poco  han  cambiado  con  la  introducción  del

Código  Penal  de  2004.    Surgen  claramente  del  texto  de  la

enmendada  Ley  Núm.  465,  *supra*,  prácticamente  las  mismas

conductas  punibles  que  las  previamente  establecidas  en  el

Código  Penal.[21]  No  obstante,  no  se  incluyó  definición  del

término  "lotería",  pero  sí  se  incorporó  la  palabra

"clandestina".    Puesto  que  se  señalan  violaciones  al

---

[20] "[C]uando una ley es derogada deja de existir". *García Passalacqua v. Tribunal Electoral*, 105 D.P.R. 49 (1976).

[21] En *Pueblo v. Figueroa Pomales,* 172 D.P.R. __ (2007); 2007 T.S.P.R. 188; 2007 J.T.S. 179, señalamos que dado que todos los elementos del delito habían sido tipificados con anterioridad por el legislador, pero ante la ausencia de la definición de uno de los términos, la controversia se convierte en una de interpretación estatutaria.  En vista de lo anterior, y al haberse combinado y reformulado los artículos en el derogado Código Penal, la trayectoria de dichas disposiciones nos asisten a la hora de interpretar el significado y alcance del estatuto vigente.

De igual forma, la jurisprudencia interpretativa de estos delitos según tipificados en el anterior Código Penal es aplicable al caso de autos. Véanse *Pueblo v. Pérez Pou*, 175 D.P.R. __ esc. 1 (2009), 2009 T.S.P.R. 5, 2009 J.T.S. 8; *Martínez v. Junta de Planificación*, 109 D.P.R. 839 (1980)("La identidad de lenguaje tiene fuerza persuasiva en la tarea de hermenéutica estatutaria, pues se presume que la Asamblea Legislativa conoce la interpretación del foro judicial y la estima correcta".)

principio de legalidad y a la doctrina de vaguedad, analizamos ambas palabras.[22]

En primer lugar, el Diccionario de la Real Academia Española indica entre las definiciones de lotería:

> …especie de rifa que se hace con mercaderías, billetes, dinero y otras cosas, con autorización pública[; j]uego casero semejante a la lotería primitiva con números impresos en cartones, y en el que se extraen algunos de una bolsa o un bombo[; l]ugar en que se despachan los billetes de lotería[, y n]egocio o situación que se resuelve mediante la suerte o la casualidad. Real Academia Española, Diccionario de la Lengua Española, Ed. Espasa, Madrid, 2001, pág. 1399-1400.

Del uso común y corriente del término podemos concluir que la palabra "lotería" se refiere a cualquier juego o plan para la disposición o distribución de dinero o bienes que cumpla con los elementos de todo juego de azar: pago, suerte y premio. Nada nos indica que este significado haya cambiado. Además, ésta definición se confirma al analizar la verdadera intención legislativa, pues surge del historial legislativo de la Ley Núm. 321, *supra*, que la intención legislativa era transferir los delitos del Código Penal a la Ley Núm. 465, *supra*, y no eliminarlos o crear nuevos delitos.

Por otro lado, el término "loterías clandestinas" no se encontraba previamente en el texto del Artículo 14 de la Ley Núm. 465, *supra*, antes de ser enmendado por la Ley

---

[22] En repetidas ocasiones este Tribunal ha atendido reclamos de inconstitucionalidad de las leyes de juegos de azar. Véanse, *Pueblo v. Troche Mercado*, 105 D.P.R. 501 (1976); *Pueblo v. Pérez Méndez*, 83 D.P.R. 228 (1961).

Núm. 321, *supra*.  Pero ese término está contenido en una de las leyes de juego, la Ley Núm. 220 de 15 de mayo de 1948, según enmendada, conocida como Ley de la Bolita, 33 L.P.R.A. secs. 1247 *et seq.*, y ha sido analizado por este Tribunal.  En *Pueblo v. Adorno Medina*, 92 D.P.R. 554 (1965) expresamos que la lotería clandestina es aquella "cuyo renglón de apuesta y tabla de premios no tiene la supervisión ni la publicidad requerida por el Estado para las loterías legalizadas". Por consiguiente, este término cuenta con un significado jurídico; no es simplemente aquélla hecha secretamente por temor a la ley como aducen los peticionarios, sino aquella no sancionada por el Estado.

De conformidad con lo que hemos expresado, no podemos concluir que la falta de una definición del término "lotería clandestina"  en el texto de la ley la haga incierta y no provea suficiente advertencia de la conducta punible. Esto, principalmente porque tal término es ampliamente entendido según el contexto y el significado sancionado por el uso común y corriente; se conforma a la verdadera intención del legislador, y cuenta con una definición jurisprudencial que ha sido adoptada por este Tribunal. Asimismo, la ley no se presta para su aplicación arbitraria y discriminatoria pues la definición adoptada provee los elementos para guiar a aquellos que la

aplican.[23] Tampoco interfiere con el ejercicio de derechos fundamentales garantizados por la Constitución.

En vista de todo lo anterior, concluimos que la Ley Núm. 465, *supra*, no adolece de vaguedad ni contraviene el principio de legalidad, pues provee aviso adecuado de la conducta prohibida. Un ciudadano común puede conocer lo que está prohibido y permitido a través del término lotería, a pesar de que éste ya no cuenta con un articulado independiente que lo defina.

Asimismo, concluimos que el juego "Raspa y Gana" cumple con todos los elementos del juego prohibido. Existe la prestación, o sea, la compra de un cartón de juego por un dólar ($1.00); media la suerte, puesto que los números del cartón ya están preestablecidos por lo que el jugador no tiene control alguno sobre el resultado, y existe un premio que fluctúa entre cinco hasta cinco mil dólares ($5.00-5,000.00).

Puesto que en nuestro ordenamiento existe una prohibición de los juegos de azar y loterías, salvo contadas excepciones en las que no cae el juego en cuestión, no procede la petición de la compañía peticionaria de que declaremos que el juego "Raspa y Gana" se encuentra dentro del marco de la ley. Esto a pesar del fin loable que persiga.

---

[23] Existen diversas modalidades de "lotería", como por ejemplo, el juego de loto o lotería denominado `bingo´ que está prohibido por nuestro ordenamiento, salvo para fines caritativos o educativos según dispuesto en ley. Ley Núm. 242, *supra*. Lo importante para identificar las modalidades son los tres elementos de pago, azar y premio.

## VI

Aunque por fundamentos distintos, se confirma la Sentencia dictada por el Tribunal de Apelaciones. Ciertamente, el juego "Raspa y Gana" es una lotería no autorizada por la ley. Por consiguiente, se desestiman las causas de acción restantes.

Se dictará Sentencia de conformidad.


                                    Mildred G. Pabón Charneco
                                         Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Boys and Girls Clubs of Puerto Rico, Inc., PBL of Puerto Rico, Inc.<br><br>    Demandantes-Peticionarios<br><br>              v.<br><br>Hon. Juan C. Méndez Torres, Secretario del Departamento de Hacienda, Teresita Carrión Geigel, en su carácter oficial como Secretaria Auxiliar de Lotería; y Teresita Carrión Geigel en su carácter personal y su esposo Fulano de Tal y la Sociedad Legal de Gananciales compuesta por ambos; Estado Libre Asociado de Puerto Rico; Aseguradora A, B, y C; Zutanos de Tal<br><br>    Demandados-Recurridos | CC-2007-0970 | *Certiorari* |

SENTENCIA

San Juan, Puerto Rico a 4 de agosto de 2010.

   Aunque por fundamentos distintos, se confirma la Sentencia dictada por el Tribunal de Apelaciones. Ciertamente, el juego "Raspa y Gana" es una lotería no autorizada por la ley. Por consiguiente, se desestiman las causas de acción restantes.

   Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo.


                    Aida Ileana Oquendo Graulau
                    Secretaria del Tribunal Supremo